*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* DOYEN/EMANUELSON, Minors.

UNPUBLISHED
July 30, 2026
1:50 PM

No. 376682
Marquette Circuit Court
Family Division
LC No. 23-010773-NA

Before: MARIANI, P.J., and O'BRIEN and WALLACE, JJ.

PER CURIAM.

Respondent appeals as of right the trial court's order terminating his parental rights to the three minor children, RD, JD, and LE, under MCL 712A.19b(3)(c)(*i*) (conditions that led to adjudication continue to exist). We affirm.

## I. BACKGROUND

Marquette County Children's Protective Services (CPS) was contacted on October 20, 2022, and opened an investigation into respondent's household after law enforcement responded to a domestic-violence altercation between respondent and the children's mother[1] that occurred while the children were present. On November 23, 2022, CPS opened an ongoing case for improper supervision because of continued physical and verbal altercations between the two in the home with the children present. On April 23, 2023, RD and JD were removed from respondent's care and custody due to emotional instability and domestic violence. Petitioner, the Michigan Department of Health and Human Services (DHHS), filed a petition on April 25, 2023, seeking to remove RD and JD from respondent's care "due to ongoing domestic violence altercations that puts the children at direct risk of physical injury." The petition alleged that law enforcement had responded to respondent's home 19 times since January 8, 2023, "for investigation for family troubles, investigation for suspicious situations and assault and battery." The petition also alleged that respondent had four additional biological children no longer under his care or custody. A CPS

---

[1] The children's mother is not a party to this appeal.

worker forensically interviewed an older child living in the home that was the mother's biological child but not respondent's. The child reported that respondent "consistently threatens to kill his mom and that he is afraid of him." The petition also alleged that respondent stated that he would "kill his children before they would be taken away from him." The reasonable efforts made to prevent the removal of the children included: "Families First, Family Team Building Solutions, Cell phone, payment of rent to avoid eviction, Law Enforcement intervention, Safety Planning, Family Team meetings, drug screens, Pathways, MSHDA, DHHS assistance including gas cards, phone card, crib, pack and play, clothing, diapers, shampoo, baby wash and backpacks." For example, the petition alleged that on February 3, 2023, a Family Together Building Solutions worker found that respondent had JD sleeping on a pile of blankets on the floor, so CPS provided respondent with a pack and play.

The third child, LE, was born on August 13, 2023, while the case was in progress. Respondent pleaded no contest to an amended petition on August 14, 2023, and was ordered by the court to participate in and show benefit from services provided by or monitored by petitioner. The court ordered that respondent participate in Family Support Education; undergo a psychological evaluation or release the results of an evaluation taken within the past year, and follow the recommendations; participate with Pathways Community Mental Health, and sign a release of information to Community Mental Health; take medications as prescribed; participate in a domestic violence class at the Women's Center; participate in Early On Services for the children; follow the parenting guidelines; and participate in supervised parenting time not less than twice per week for two hours at a time.

From the outset and over the course of the two-year case, respondent maintained an acrimonious relationship with petitioner's employees, including three separate caseworkers. Respondent was banned from in-person visits at petitioner's Marquette office after multiple incidents with the first caseworker where respondent's behavior made her feel unsafe. After being banned, respondent initially refused to attend virtual visits because JD was too young to participate. Eventually, respondent and petitioner compromised, and petitioner began holding parenting times in a Marquette library. Respondent's attendance improved for a while until there was another incident with the first caseworker. A second caseworker then began overseeing respondent's case. Around this time, respondent began having difficulties with his vehicle and was inconsistently attending in-person parenting times. Respondent's attendance at virtual sessions was also inconsistent.

RD and JD returned to the mother's care on September 21, 2023. On May 10, 2024, a new petition was filed to remove the children, including LE, from the mother due to her emotional instability, recent substance abuse, allowing inappropriate adults in the home, and domestic violence incidents occurring in the presence of the children. Regarding respondent, the petition alleged that it was "contrary to the welfare of the children to be in the care and custody of [respondent] due to his continued lack of progress in his foster care case which includes his emotional instability, housing, and parenting." At the emergency preliminary hearing held on the same date as the filing of the new petition, the court noted that respondent continued to reside in his uncle's attic, which was unfit for the children, and had not completed the parenting course or participated in most parenting times. The court stated that RD and JD had already been removed from respondent's care, but that LE would now be removed as well. The court found that a substantial risk of harm existed if LE remained in respondent's care and noted that respondent had

not progressed enough with emotional stability. The court also found that petitioner had made reasonable efforts.

An amended petition was filed by petitioner on July 24, 2024, again alleging respondent's continued issues with emotional stability, housing, and parenting skills, and added that respondent also had ongoing issues with domestic relations and employment. The petition alleged that respondent was living in his car, which was not a proper living arrangement for the children. Respondent admitted to the allegations in the amended petition.

After providing services for nearly two years, petitioner filed a petition to terminate respondent's parental rights as to all three children on April 25, 2025. The second and third caseworkers testified that respondent missed nearly half of the parenting-time sessions, remained combative and unable to regulate his emotional responses, was resistant to signing release forms to provide petitioner information regarding his engagement with services, and had not secured appropriate housing for the children to be released into his custody. Furthermore, these caseworkers and the children's foster parents testified that the children often exhibited emotionally dysregulated, self-injurious, and violent behavior after attending parenting times with respondent. The caseworkers agreed that respondent had not rectified his barriers to reunification and that termination was in the best interests of the children.

Respondent testified that petitioner was purposefully painting him and his participation in a bad light. He asserted that petitioner often provided him with conflicting or otherwise unhelpful guidance on how to secure or manage housing, employment, or disability income. He argued that the caseworkers would purposefully trigger him during parenting times and that their descriptions of his behavior at parenting times were inaccurate. Respondent contended that he secured parenting classes, vehicle-repair assistance, and a housing voucher on his own. Additionally, he noted that he was applying for Social Security Disability Insurance (SSDI) without assistance from petitioner. Concerning missed parenting-time sessions, respondent proclaimed that the caseworkers were misrepresenting the number of sessions by including sessions that he was not allowed to attend from the period of time where he was banned from petitioner's office. He testified that he was currently living in a motel but had recently applied for SSDI, and he believed he would soon have appropriate housing for the children.

The court found petitioner's representatives more credible than respondent. It found that respondent failed to show meaningful progress in addressing his barriers to reunification and that petitioner had shown by clear and convincing evidence that there was no reasonable likelihood that the conditions that led to adjudication would be rectified within a reasonable time considering the children's ages. The court further found that termination was in the best interests of each of the children because respondent failed to show meaningful progress throughout the two-year duration of the case, largely failed to comply with the service plan, and could not provide the structure, routine, and predictability that the children needed. Additionally, the court considered that the foster parents were willing to adopt the children and provide permanency. The court ultimately terminated respondent's parental rights to each child. Respondent now appeals.

## II.  ANALYSIS

### A.  REASONABLE EFFORTS

Respondent argues that petitioner failed to make reasonable efforts to enable the children to return to his care by not making any accommodations for respondent's disabilities.  We disagree.

This Court reviews the trial court's factual finding that petitioner made reasonable efforts to reunify respondent with the children for clear error.  *In re Atchley*, 341 Mich App 332, 338; 990 NW2d 685 (2022) (citation omitted).  "A finding is clearly erroneous if, although there is evidence to support it, this Court is left with a definite and firm conviction that a mistake has been made."  *Id.* (citation omitted).

"Under Michigan's Probate Code, the [DHHS] has an affirmative duty to make reasonable efforts to reunify a family before seeking termination of parental rights."  *In re Hicks/Brown*, 500 Mich. 79, 85; 893 NW2d 637 (2017).  Petitioner's duty to make reasonable efforts includes the creation of a service plan containing steps that the agency and the parent "will take to rectify the issues that led to court involvement and to achieve reunification."  *Id*. at 85-86 (quotation marks and citation omitted).  Even though petitioner "has a responsibility to expend reasonable efforts to provide services to secure reunification, there exists a commensurate responsibility on the part of respondents to participate in the services that are offered."  *In re Frey*, 297 Mich App 242, 248; 824 NW2d 569 (2012).  A respondent-parent must also demonstrate that they have "sufficiently benefited" from the services provided.  *Id.*  "When challenging the services offered, a respondent must establish that he or she would have fared better if other services had been offered."  *In re Sanborn*, 337 Mich App 252, 264; 976 NW2d 44 (2021).

Our Supreme Court has stated that public entities, such as petitioner, must make "reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless . . . the modifications would fundamentally alter . . . the service provided."  *In re Hicks/Brown*, 500 Mich at 86, citing 28 CFR 35.130(b)(7) (2016) (quotation marks omitted).  The term "disability," for the purposes of the Americans with Disabilities Act (ADA), 42 USC 12101 *et seq*., is defined as a "a physical or mental impairment that substantially limits one or more major life activities" of an individual.  42 USC 12102(1)(A).  This Court has recognized as well that "*a known or suspected* intellectual, cognitive, or developmental impairment" qualifies.  *In re Hicks*, 315 Mich App 251, 281-282, 890 NW2d 696 (2016), aff'd in part and vacated in part 500 Mich 79 (2017) (emphasis in original).

Respondent first argues that petitioner failed to make reasonable accommodations in light of respondent's mental-health challenges.  Respondent asserts that he has a diagnosis of bipolar disorder, ADHD, persistent depressive disorder, insomnia, unspecified personality disorder, and PTSD.  Acknowledging respondent's issue with self-regulation, the court provided respondent with a guardian ad litem to help him navigate the court process and the reunification process.  Respondent also had a Pathways case manager to help him with medication management, case management, counseling, and paperwork.  Respondent fails to assert what accommodations petitioner should have made, nor has he demonstrated that he would have fared better in mitigating his barriers to reunification had any such accommodations been made.

Regarding parenting time, respondent notes in his brief on appeal that petitioner asserted that respondent was offered 193 parenting-time visits, but he participated in only 27 in-person visits and 19 virtual parenting-time visits. Respondent blames his failure to attend parenting time on petitioner's supposed lack of effort to mitigate the barriers to respondent's participation in those visits. Respondent argues that he was offered gas cards when his vehicle was not functional and that he was never offered any other transportation for visits or the option to change the location of the visits. Respondent claims that when he complained that he did not have WiFi access for virtual visits, he was only offered a list of places with free WiFi that were not within walking distance for him. Finally, he claims he was never given a prepaid cellular data card or other accommodation that would help him.

The record belies respondent's arguments regarding parenting time. First, respondent ignores that he created his own issues with parenting time when he was banned from in-person visits at petitioner's Marquette office after multiple incidents with a caseworker where respondent's behavior made her feel unsafe. After being banned, respondent refused to attend virtual visits because JD was too young to participate. Eventually, respondent and petitioner compromised, and petitioner began holding parenting times in a Marquette library until there was another incident with a caseworker and a new caseworker took over the case. The record also shows that petitioner provided gas cards while respondent's vehicle was operational. Respondent notes that the locations with free WiFi that petitioner identified for him were not within walking distance and were therefore insufficient; however, one case manager testified that respondent had been seen driving around the area of his residence. Respondent next asserts that he should have been provided a prepaid cellular data card or other accommodation; however, the record does not show that respondent asked for a data card from either the court or petitioner during the two-year duration of the case.

Respondent did request that parenting times occur in person closer to where he was residing. The court was willing to enter an order providing that parenting time could occur at respondent's residence, so long as the children's guardian ad litem and petitioner agreed. At the time of termination, the court noted that respondent never progressed to unsupervised parenting time and failed to demonstrate the requisite safety and emotional stability necessary to persuade petitioner and the guardian ad litem to allow visits at his residence. There were multiple periods throughout the case where respondent either simply refused to engage with virtual parenting times or was wholly unavailable for them. Because the record demonstrates that respondent did not participate in the parenting time offered to him, the court did not clearly err in finding that reasonable efforts were made to engage respondent in parenting-time services.

Respondent further argues that the parenting-class resources provided by petitioner were insufficient. Respondent and one of the caseworkers had differing testimony as to who enrolled respondent at Pregnancy Services of Delta County; however, both agreed that respondent was enrolled in classes. At the termination hearing, the caseworker testified that other parenting classes were sought by petitioner, but the other options could not enroll respondent for various reasons. Nonetheless, respondent had a duty to fully participate in services, and respondent failed to complete the course he was enrolled in of his own volition. A few months prior to the termination hearing, petitioner offered a virtual class through Michigan State University. Petitioner was not able to offer that class to respondent until that time because respondent disappeared for nearly two months and could not be reached by anyone, including his own counsel and lawyer-guardian ad

litem. The record reflects that when respondent returned, the court and petitioner were operating with the belief that respondent was still attending parenting classes at Pregnancy Services. Respondent argues that the caseworkers did not provide assistance or guidance for how to successfully interact with the children during parenting-time visits, but the caseworkers reported that they were unable to provide feedback to respondent regarding his parenting without him yelling at and berating the caseworkers. Thus, the court did not clearly err in finding that petitioner made reasonable efforts to engage respondent in services meant to address his parenting-skills barrier to reunification.

Respondent next argues that petitioner made no effort to confirm respondent's application for SSDI or otherwise assist with "resource management." Respondent's argument is misplaced because the record shows that petitioner was aware that respondent's application for SSDI was in progress but understood that his mental-health provider was working with him on that application. This Court is not sure what respondent is referring to with the terms "resource management." However, an additional barrier for respondent was housing, and the record reflects that respondent had a Michigan State Housing Developmental Authority voucher, and that petitioner supplied respondent with lists of potential residences that accepted housing vouchers and followed up to provide the housing authority supporting documentation at respondent's request. The record supports the court's finding that respondent was provided with housing applications and assistance as a reasonable effort toward reunification.

Respondent lastly argues that petitioner made no attempts to confirm the completion of a psychological assessment or schedule one for him. This argument is contradicted by the record. The record reflects multiple requests from petitioner and the court for respondent to undergo and produce a psychological evaluation. Respondent either refused such requests or produced unsatisfactory documentation. Petitioner did not have a duty to force respondent to undergo a new psychological evaluation or force respondent to produce the results of the one he claimed to have undergone prior to the beginning of the case. The record reflects that respondent was continuously provided counseling and psychiatric services through a mental-health service provider throughout the case. Respondent refused to sign releases for the caseworkers to discuss his mental health services with Pathways. Respondent never asserted that he needed additional mental-health services, declined an anger management class and a domestic violence class, and was resistant to involving petitioner further in these services. The court did not clearly err in finding that reasonable efforts were made to address respondent's emotional stability and mental health.

For the foregoing reasons, we are not left with a definite and firm conviction that the court made a mistake in finding that petitioner made reasonable efforts to reunify respondent with the children. Therefore, the court did not clearly err.

## B. BEST INTERESTS

Respondent next argues that the trial court clearly erred in its finding that termination of his parental rights was in the best interests of the children. We disagree.

Respondent does not contest that the trial court properly found a statutory ground to terminate respondent's parental rights. "Once a statutory ground for termination has been proven, the trial court must find that termination is in the child's best interests before it can terminate

parental rights." *In re Olive/Metts Minors*, 297 Mich App 35, 40; 823 NW2d 144 (2012). "In deciding whether termination is in the child's best interests, the court may consider the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home." *Id.* (citations omitted). The trial court may also consider "a parent's history of domestic violence, the parent's compliance with his or her case service plan, the parent's visitation history with the child, the children's well-being while in care, and the possibility of adoption." *In re Mota*, 334 Mich App 300, 321; 964 NW2d 881 (2020) (quotation marks and citation omitted). A trial court has the duty to determine the best interests of each child individually. *In re Olive/Metts*, 297 Mich App at 42. "The focus at the best-interest stage has always been on the child, not the parent." *In re Keillor*, 325 Mich App at 93 (quotation marks and citation omitted). "The trial court should weigh all the evidence available to determine the children's best interests." *In re White*, 303 Mich App at 713.

As to RD, the trial court found that respondent and RD were not strongly bonded, and it noted that RD had hardly seen respondent for the two-year duration of the case and that her behavior was dysregulated after visits. This finding is supported by the testimony of two caseworkers at the termination trial. Additionally, the court emphasized that RD needed structure, routine, and predictability and found that respondent could not provide the necessary components for her to address her trauma. The record of respondent's attendance at parenting times is evidence supporting the court's finding that he could not provide such consistency. The period where respondent vanished from the case entirely without responding to any party's attempts to contact him provides further evidence supporting the court's finding. Finally, the court's finding was supported by respondent's lack of participation in RD's occupational therapy and mental-health appointments.

Concerning JD, the court noted that JD came into care with a habit of hitting her head when she was upset, and she would resume this behavior after visits with respondent. The court also found that JD did not have a bond with respondent, noting that she had expressed that she does not like respondent. The court's findings were supported by testimony from one of the caseworkers and the foster parent of the children. The court also noted that JD had issues with emotional self-regulation and verbal expression. It found, based on the testimony of the foster parent, that both conditions had improved while the child was in foster care. Regarding LE, the court noted that he came into care very underdeveloped in his gross motor skills; however, by the time of the termination hearing, he had improved his motor skills and was happy.

As to all three children, the court looked to the advantages that the children's foster placement offered over return of the children to respondent's custody. The court noted that it was clear that the children were thriving under the foster parents' care. This finding was supported by a caseworker's testimony that the middle child expressed preference for her foster father over respondent, as well as the foster parent's testimony concerning the services that the children were enrolled in and their improvement in behavior. The court also considered respondent's history of domestic violence within the household and his lack of compliance with the case service plan. The court noted that respondent had been the victim of domestic violence by the children's mother and that there were suggestions that he had perpetrated domestic violence against her. Nonetheless, it stated that the children had in fact witnessed violence between the parents in the household and that there was a lengthy record of police responding to the home for this reason. These findings by the court were supported by allegations within the petitions, including the first petition, to which

respondent pleaded no contest, and a later amended petition, to which respondent pleaded admission. The court also found issues with respondent's compliance with the case service plan. As noted, respondent failed to participate in a significant portion of scheduled parenting times, failed to complete the parenting class he was enrolled in, failed to provide a sufficient psychological evaluation to the court and petitioner, and failed to secure housing and employment or SSDI.

Respondent offers the following factual assertions as implicitly demonstrating that the court's decision was against the preponderance of the evidence. Respondent notes that he sought out parenting classes on his own, that he found help from a government program to get his vehicle repaired, that he showed up prepared for in-person visitation with snacks and activities, and that he is bonded to his children. In the best-interest stage of the case, the focus is on the children, not the parent. Respondent's factual assertions that he offers up as support for his argument focus on himself, not the children. The only assertion that respondent makes regarding the children is that he is bonded with them. However, the evidence in the record reflects the opposite, that he was not bonded with the children. He states that he showed up for in-person visits prepared, but he missed the majority of scheduled parenting-time visits and the children needed consistency. Additionally, the evidence put forth by respondent is largely based on respondent's own testimony, which the court found less credible than the testimony of petitioner's representatives.

In conclusion, there was a preponderance of evidence supporting the court's determination that termination of respondent's parental rights was in the best interests of each of the minor children. We are not left with a definite and firm conviction that a mistake was made. Therefore, the trial court did not clearly err.

Affirmed.

/s/ Philip P. Mariani
/s/ Colleen A. O'Brien
/s/ Randy J. Wallace